**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

**VIDA M. NAKAS,**

      **Plaintiff,**

**vs.**                      **Case No. 5:09cv358-RS/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D). It is recommended that the decision of the Commissioner be reversed and remanded for further consideration.

**Procedural status of the case**

Plaintiff, Vida M. Nakas, applied for disability insurance benefits. Her last date of insured status for disability benefits was December 31, 2006. Plaintiff alleges disability due to fibromyalgia, lupus, depression, and anxiety, with onset on April 10, 2004. Plaintiff was born in May, 1959, and was less than 50 years old during the period of her

claim. She has a college education, and has past relevant work as a director and coordinator of training.

The Administrative Law Judge found that Plaintiff has the residual functional capacity to perform unskilled sedentary work. She determined that Plaintiff can sit for up to six hours a day, and stand or walk for up to two hours a day, and can lift 10 pounds occasionally and less than 10 pounds frequently. Relying upon the "grids,"[1] the ALJ determined that Plaintiff was not disabled.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire

---

[1] Appendix 2 to Subpart P of Part 404 – Medical-Vocational Guidelines, found at: http://www.ssa.gov/OP_Home/cfr20/404/404-ap11.htm

record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Both the "impairment" and the "inability" must be expected to last not less than 12 months. <u>Barnhart v. Walton</u>, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)-(f):

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

      4.      Does the individual have any impairments which prevent past relevant work?

      5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the hearing**[2]

The administrative hearing was held on August 17, 2006.  R. 336.  Plaintiff said that she had not looked for a job since she moved to Florida due to lack of energy and

---

[2] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at < http://www.pdrhealth.com/drugs/drugs-index.aspx >. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS, available at:  http://www.mercksource.com (Medical Dictionary link) or MEDLINE PLUS, found at www.nlm.nih.gov/medlineplus/mplusdictionary.htm.  Social Security Rulings can be found at:  http://www.ssa.gov/OP_Home/rulings/rulfind1.html.    The pages at these websites are not attached to this report and recommendation as the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

anxiety.  R. 348.  She said that she sleeps a lot during the day, and did not think she

could handle a job and the drive to work.  R. 349.

Plaintiff said that she had not had continuing treatment from her rheumatologist

(Dr. Crayton) because she could not afford it.  R. 350.  She said she received consistent

mental health treatment from her psychiatrist, Dr. Patel, and used her savings to pay for

that.  *Id*.  She said she saw Dr. Patel for medications and Robbie Cutler for counseling.

*Id*.

Plaintiff said that her joints are swollen from lupus and fibromyalgia, and her back

aches.  R. 351.  She said that this is a daily condition.  *Id*.  She moved to Florida to live

with her parents in 2002, and said that used to be able to walk with them, but now can

hardly walk half a block.  R. 342, 351.  She thought that she could walk now only about

10 minutes.  R. 351.  She said her back and hips hurt, her hands are in pain and are

swollen, her ankles swell if she does not elevate her feet, and she can no longer write.

*Id*.  She did not think she could sit for more than 5 or 10 minutes.  *Id*.  She said that after

sitting, her neck and shoulders begin to ache.  R. 352.  She said that having to move a

small object with her hands for a 20 minute period causes pain and problems with her

hands.  *Id*.  She said that fatigue is "very much" associated with this pain.  R. 353.

Plaintiff said that she takes a four hour nap every day.  *Id*.

Plaintiff said that her depression and anxiety had improved with medications and

counseling, but were not cured.  R. 355.  She said that avoidance of social situations

reduces anxiety.  R. 364.  She said that her anxiety and depression had been worse in

the two months leading to the hearing, and that she had anxiety attacks, each lasting a

few hours, about ten times a month.  R. 356.  She said she had crying spells about 20

days a month.  R. 357.  Plaintiff said she does not enjoy social situations.  R. 358.  She

said she used to play volleyball and was socially very active.  R. 360.  Plaintiff said she

took Xanax[3] for anxiety, and that "flattens me out," making her "fuzzy and slow."  R.

358.  Plaintiff said that due to pain, she does not do household chores such as washing

dishes or cleaning.  R. 359.

Plaintiff said that Dr. Crayton did not prescribe medication for her any more, and

that she got samples from family members who are physicians.  R. 361.  She had not

seen her psychological counselor, Ms. Cutler, for about six months because she could

not afford more frequent visits.  R. 362.  She said that she sees Dr. Patel every six

months for her prescriptions.  *Id.*  She said she had traveled by herself to Washington,

D.C., for a family event.  R. 362-363.

Plaintiff said that she swims a couple of times a week as therapy for her

fibromyalgia.  R. 364-365.  She tends not to swim in the lake near her home when other

people are there.  R. 364.

The ALJ stated that she knew that Plaintiff's mother had been ill from reports

from Ms. Cutler.  R. 365.  Plaintiff said that her parents are in "fairly good health."  *Id.*

Plaintiff said that her parents need assistance from her "on occasion" but are physically

able to take care of themselves.  *Id.*

---

[3] Xanax is a tranquilizer used in the short-term relief of symptoms of anxiety or the treatment of anxiety disorders. Anxiety associated with depression is also responsive to Xanax.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

Plaintiff said she had gained about 100 pounds in the prior five years.  R. 366.

She thought that her weight gain was caused by her medication.  *Id*.  She was taking

Plaquenil,[4] Celebrex,[5] Xanax, Lexapro,[6] and Trazodone.[7]  *Id*.

The vocational expert testified that missing three days a month would eliminate

jobs and becomes "problematic," but would not eliminate all jobs.  R. 370.  Missing four

or more days a month would eliminate all jobs.  *Id*.  The ALJ did not rely upon the

vocational expert to identify jobs which Plaintiff might be able to do within her residual

functional capacity.

### Medical evidence

Plaintiff sought mental health treatment on June 7, 2000.  R. 192.  She was

taking Zoloft[8] and Trazodone.  She related that she had been treated in the past for

depression and panic.  R. 192.  She said she had limited social contacts.  *Id*.  She said

---

[4] Plaquenil is prescribed for the prevention and treatment of certain forms of malaria. Plaquenil is also used to treat the symptoms of rheumatoid arthritis such as swelling, inflammation, stiffness, and joint pain.  It is also prescribed for lupus erythematosus, a chronic inflammation of the connective tissue.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[5] Celebrex is prescribed for acute pain, menstrual cramps, and the pain and inflammation of osteoarthritis, ankylosing spondylitis (rheumatoid arthritis of the spine), and rheumatoid arthritis.  It is a member of a new class of nonsteroidal anti-inflammatory drugs (NSAIDs) called COX-2 inhibitors.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[6] Lexapro is prescribed for major depression a persistently low mood that interferes with daily functioning.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[7] Trazodone hydrochloride, sold as Desyrel, is an antidepressant.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[8] Zoloft is prescribed for major depression – a persistently low mood that interferes with everyday living.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

her problem was lack of motivation and energy. R. 199. She said she was in good

general health. R. 194. Her mood was found to be depressed on examination. R. 195.

Her attention was good. *Id*. The examiner, a physician, determined that Plaintiff had

medium impairment in interpersonal and neuro-vegetative functioning, but was only

mildly impaired for work. R. 196. A Global Assessment of Functioning (GAF) score of

50 was assigned, with a GAF for the past year of 60.[9]

    After several visits to the psychiatrist, R. 190-191, on April 2, 2001, Plaintiff

reported that she had started to feel better. R. 189. It was noted that she had recently

been diagnosed with lupus (systemic lupus erythematosus,[10] or SLE) and was taking

---

[9] Axis V of the DSM-IV Multiaxial System and the meaning of the GAF scores is explained at: http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp." The GAF scale reports a 'clinician's assessment of the individual's overall level of functioning.' *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 1994)." Sims v. Barnhart, 309 F.3d 424, 427 n. 5 (7th Cir. 2002).

    GAF scores of 41 to 50 reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Manual at 34. GAF scores of 51-60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 663 n. 2 (8th Cir. 2003).

[10] Systemic lupus erythematosus is a chronic inflammatory disease, usually febrile, with damage to the skin, joints, kidneys, nervous system, mucous membranes, and less often other organs; it usually has periods of remissions and exacerbations. It is primarily a disease of women, occurring five to ten times more often in females than in males. Although the peak incidence is between 30 and 40 years of age, the condition has also been diagnosed in the very young and the very old. SLE is the classic prototype of an autoimmune disease of connective tissue. Its cause is unknown, but the high level of autoantibodies in affected persons indicates a defect in the regulatory mechanisms that sustain self-tolerance and prevent the body from attacking its own cells, cell constituents, and proteins. Clinical manifestations are diverse, because this

Relafen.[11]  *Id.*  On August 2, 2001, she told her psychiatrist that her good days were

"few and far between."  R. 188.  She was then taking Zoloft, Trazodone, Relafen, and

Plaquenil.  *Id.*  On February 20, 2002, she told her psychiatrist that she was moving to

Florida on April 1st to be with her parents were, and that she had lost her job at the end

of October, 2001, partly due to "corporate downsizing."  *Id.*

On February 21, 2002, Plaintiff was seen by Monica Stewart, M.D., a

rheumatologist.  R. 128-129.  Dr. Stewart noted a history of lupus, and Plaintiff reported

that she had polyarthralgias for the past year, off and on.  R. 128.  Plaintiff said that she

had had pain and swelling in her hands, wrists, knees ankles and toes.  *Id.*  Plaintiff said

that the pain was constant and had been worse the prior summer.  *Id.*  Plaintiff said that

she had been laid off from work, was applying for disability, and was going to live with

her parents.  *Id.*  On examination, Dr. Stewart found no synovitis in Plaintiff's joints.  *Id.*

Dr. Stewart's diagnosis was SLE, including positive ANA, positive dsDNA, and high

ESR, polyarthritis, fatigue, stiffness, alopecia,[12] bilateral CTS (carpal tunnel syndrome),

depression, and obesity.  R. 129.  She noted that Plaintiff was applying for disability.  *Id.*

---

type of lupus affects connective tissue throughout the body.  Typically, the patient seeks medical help for relief of fever, weight loss, joint pain, the characteristic butterfly rash, pleural effusion and pleuritic pain, and nephritis.  Either mild glomerulonephritis or heart problems such as myocarditis, endocarditis, or pericarditis, are found in about half the patients with SLE.  Pulmonary disease, gastrointestinal disturbances, and lymph node involvement are also common.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[11] Relafen, a nonsteroidal anti-inflammatory drug, is used to relieve the inflammation, swelling, stiffness, and joint pain associated with rheumatoid arthritis and osteoarthritis. PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[12] Alopecia is loss of hair, wool, or feathers.  MEDLINE PLUS (MERRIAM-WEBSTER).

On May 29, 2002, Plaintiff saw Hulon E. Crayton, M.D., a rheumatologist. R.

259. She was then taking Relafen, Plaquenil,[13] Zoloft, Trazodone, and had been taking

Ov-Con for 20 years for dysmenorrhea.[14] *Id.* Dr. Crayton noted that Plaintiff's diagnosis

for lupus by Dr. Stewart had occurred on March 1, 2002, but said that she had had

symptoms for a least 6 months before that. *Id.* He noted that Plaintiff had "pain in order

of severity in her hands, knees, toes, ankles, forearms, neck, and shoulders." *Id.*

Plaintiff reported that Plaquenil and Relafen had helped, but she still had significant joint

pain and fatigue. *Id.* She said that she had a master's degree. *Id.* Dr. Crayton's

examination found synovitis, primarily over the right second and third MCP

(metacarpophalangeal) joints.[15] R. 260. He also found positive fibromyalgia trigger

points. *Id.* His assessment was SLE, rule out drug induced lupus due to Ov-Con,

fibromyalgia syndrome, rule out hypothyroidism, and depression, which may be a part of

the fibromyalgia or SLE. *Id.* He said that Plaintiff needed a new local psychiatrist. *Id.*

Plaintiff returned to Dr. Crayton on June 11, 2002. R. 258. He said she had no

active synovitis, and her double stranded DNAs were negative. *Id.* He noted that

---

[13] Plaquenil is prescribed for the prevention and treatment of certain forms of malaria. Plaquenil is also used to treat the symptoms of rheumatoid arthritis such as swelling, inflammation, stiffness, and joint pain. It is also prescribed for lupus erythematosus, a chronic inflammation of the connective tissue. PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[14] Dysmenorrhea is painful menstruation. MEDLINE PLUS (MERRIAM-WEBSTER).

[15] The metacarpophalangeal joint, or MCP joint, is one of five joints in each hand that connect the metacarpal bones in the palm to the phalangeal bones in the five fingers. These joints are the large knuckles visible when the hand is clenched in a fist. See http://www.wisegeek.com/what-is-the-metacarpophalangeal-joint.htm

Plaintiff had been referred to Dr. Patel for treatment of depression.  *Id.*  He discontinued Ov-Con for one month.  *Id.*

Plaintiff returned to Dr. Crayton on July 16, 2002.  R. 257.  Plaintiff was not looking for employment, but was pursuing disability benefits.  *Id.*  She had not followed up with her psychiatrist.  *Id.*  She had full range of motion without synovitis.  *Id.*  She had discontinued the birth control medication (Ov-Con).  *Id.*

On August 2, 2002, Plaintiff was seen for a psychiatric evaluation by Rajni Patel, M.D.  R. 200.  Her chief complaint to Dr. Patel was depression.  *Id.*  Her medications at that time were Zoloft, Relafen, and Plaquenil.  *Id.*  Her medical history significant for lupus, obesity, and reported fibromyalgia.  *Id.*  Plaintiff said that the only time that she had experienced panic attacks was when she held a job which she disapproved.  R. 200-201.  Plaintiff reported that Zoloft had, at best,  helped only intermittently and moderately, and Dr. Patel wondered why other strategies or antidepressants had not been tried.  R. 201.  Plaintiff said that she had adequate sleep using Trazodone.  R. 202.  Dr. Patel found her mood was depressed and anxious, and her affect was constricted.  *Id.*  Plaintiff said that her depression was 3 at that time, on a scale of 10. *Id.*  Dr. Patel assigned a GAF score of 47.  R. 203.  He said that it was "clear that [Plaintiff's] Zoloft response has been simply unacceptable," and he decided to switch Plaintiff to Celexa.[16]  *Id.*  Dr. Patel did not think that psychological therapy would be useful.  *Id.*  He concluded: "In terms of her ability to work, at this point it appears that given lupus, fibromyalgia, and clear depression, she is not capable of working."  *Id.*

---

[16] Celexa is used to treat major depression.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

On October 16, 2002, Plaintiff saw Dr. Crayton.  R. 256.  She had switched from Zoloft to Celexa.  *Id*.  She had felt no change in her depression.  *Id*.  She still had daytime fatigue, but had no medication side effects from the medications she was then taking.  *Id*.  Plaintiff had 1+ synovitis at the right second and third MCP joint.  *Id*.  She reported that she was having "restorative sleep."  *Id*.  Dr. Crayton added Wellbutrin.[17]  *Id*.

On November 19, 2002, Plaintiff was seen again by Dr. Crayton.  R. 255.  She said she had increased energy after starting Wellbutrin, but still had depression.  *Id*.  She had limited her daily walking due to bilateral hip pain, and she said that rest improved the pain.  *Id*.  The plan was to increase Celexa and Trazodone.  *Id*.

On December 11, 2002, Dr. Patel saw Plaintiff.  R. 270.  Plaintiff reported definite energy level improvement with Wellbutrin.  *Id*.  She was still "on the depressed side," though her mood was "clearly better."  *Id*.  Dr. Patel said:

> Indeed, she reported that her good days were not very good, and bad days not very bad.  Overall treatment response at this point appears to be moderate.

R. 270.  He thought that Plaintiff would benefit from psychotherapy and was referred for psychotherapeutic interventions.  *Id*.

On December 30, 2002, Plaintiff returned to Dr. Crayton.  R. 254.  She reported that overall she had had improvement with respect to pain.  *Id*.  Her right hand, feet, and toes were still painful, but "there has been a definite improvement."  *Id*.  She had gone a month since her last "bad day."  *Id*.  Plaintiff's depression had also improved "overall" on

---

[17] Wellbutrin is indicated for treatment of depression.  PHYSICIANS' DESK REFERENCE (2005).

the higher dose of Celexa. *Id*. Plaintiff had some swelling of her right hand. *Id*. Dr. Crayton found 1+ synovitis at the right MCP joint, but otherwise, the examination was negative. *Id*.

Plaintiff saw Robbie S. Cutler, LMHC, at the Panama City Counseling, Center, Inc., for psychological counseling from February 3, 2003, through October 30, 2003. R. 226-235. Cutler noted on February 3, 2003, that Plaintiff had been referred to Cutler by Dr. Patel, her psychiatrist, for depression from her move to Panama City, loss of a job, and recent diagnosis of fibromyalgia. R. 235. It was also noted that she had been diagnosed with lupus in 2001 and was taking medication for both. *Id*. She said she had moved to Panama City to take care of her elderly parents and due to the debilitating nature of her illness. *Id*. It was noted that her anxiety had lessened in some ways because she was unemployed. *Id*. She saw Cutler on February 12, 2003, February 17, 2003, and February 26, 2003. R. 233-234.

On March 5, 2003, Plaintiff was seen again by Dr. Patel. R. 269. Plaintiff said she had been in therapy with Robbie Cutler and had seen Cutler four times. *Id*. Dr. Patel said that Plaintiff was still "considerably depressed," which Dr. Patel characterized as mildly to moderately depressed. *Id*. Wellbutrin was increased and Celexa was lowered. *Id*.

On March 13, 2003, Plaintiff saw Cutler. R. 233. She was very emotional that day. *Id*.

On March 27, 2003, Dr. Crayton saw Plaintiff. R. 253. Her COBRA (extended health insurance after loss of employment) was to expire on March 26, 2003. *Id*. Dr.

Crayton found no synovitis on examination and said that her lupus was stable. *Id.* She also saw Cutler that day. R. 232. She was less emotional. *Id.*

On April 2, 2003, Plaintiff saw Dr. Patel. She had continued therapy with Robbie Cutler, and the increase in Wellbutrin had helped with energy level, but not in a major way with her mood. R. 268. Wellbutrin was again increased and Celexa reduced. *Id.*

On April 10, 2003, Dr. Crayton again saw Plaintiff. R. 251. Plaintiff denied any recurrence of her lupus symptoms. *Id.* Dr. Crayton tried to adjust Plaintiff's medications in anticipation of the termination of her health insurance. *Id.*

Plaintiff went to psychological counseling with Robbie Cutler on April 8, 2003, April 24, 2003, May 22, 2003, June 26, 2003, July 24, 2003, August 21, 2003, October 30, 2003, December 4, 2003, January 8, 2004, March 11, 2004, July 20, 2004, September 9, 2004, December 9, 2004, February 10, 2005, April 14, 2005, June 9, 2005, and December 1, 2005. R. 229-232, 221-225, 321-327.

On August 5, 2003, Plaintiff returned to Dr. Patel. R. 266. Plaintiff had not increased the level of Wellbutrin due to a misunderstanding. *Id.* Plaintiff said she had had an exceptionally good mood only one day out of the past several months. *Id.* Dr. Patel ordered new adjustments to Plaintiff's medications, and Plaintiff was to continue her therapy with Robbie Cutler and return in four months. R. 266-267.

On August 21, 2003, Cutler said that Plaintiff seemed to be physically stable, and had returned from a "great" trip to Michigan to see her family. R. 229. Cutler encouraged her to consider doing a part-time job. *Id.* On October 30th, she reported to Cutler that she felt better in the last month than in the past year. *Id.*

On November 20, 2003, Cutler said (via a form) that she thought that Plaintiff's mental condition met or equaled Listing 12.04A.1 (affective disorders). R. 227-228. Cutler also filled out a form as to Plaintiff's mental residual functional capacity. R. 205. Cutler thought that Plaintiff had only mild limitations in social interaction. *Id*. She thought that Plaintiff had marked limitation in ability to perform and complete work tasks at a consistent pace. R. 206. She said that Plaintiff was moderately impaired in her ability to process subjective information accurately and to use appropriate judgment, to maintain attention for more than brief periods of time, to perform production at levels expected by employers, to respond appropriately to changes in a work setting, to behave predictably and reliably in an emotionally stable manner, and to tolerate customary work pressures. R. 208-207. She said that if Plaintiff were put under stress, particularly the stress of work, her opinion would changed to marked impairment for a number of functional categories. R. 207. Cutler said that her opinion was based upon her observations during ongoing therapy and Plaintiff's diagnosis of depressive disorder. *Id*. A moderate impairment was defined on the form as one affecting but not precluding ability to function in a work setting, and a marked impairment was defined as seriously affecting that ability. R. 205.

On December 5, 2003, Plaintiff was on a much higher dose of Wellbutrin. R. 264. Plaintiff said her depressions was at level seven out of ten. *Id*. Dr. Patel said, however, that he thought her mood was significantly improved, and her depression was between mild and moderate, with intermittent anxiety. *Id*. Plaintiff's medications were again adjusted and she was to return in three months. R. 264-265.

On February 26, 2004, Plaintiff was again seen by Dr. Patel. R. 263. Plaintiff reported that her response to the combination treatment regimen was "impressive." *Id.* No side effects were mentioned or noted, and Dr. Patel said she had mild to moderate anxiety. *Id.*

On June 17, 2004, Dr. Patel said Plaintiff said Plaintiff was feeling markedly anxious. R. 262. She discussed her attempts to obtain social security benefits, and Dr. Patel explained the process. *Id.*

On September 13, 2004, Plaintiff was examined by David C. Ghostley, Psy.D., on a consultative basis for a psychological evaluation. R. 273. Plaintiff said that her main complaint was diffuse physical pain. *Id.* She reported that she earned a masters degree in management and human resources. *Id.* Plaintiff's mental status examination was essentially normal, though she reported she was depressed at level five on a scale of 10. R. 273-274. Dr. Ghostley found that Plaintiff's concentration was unimpaired as she was able to perform simple mathematical calculations and serial spelling tasks. R. 274. He found her memory functioning was grossly intact. *Id.* He found her productivity and structure of thought to be normal. *Id.* She was able to think in abstract terms, and her insight and judgment were good. *Id.* Her responses to testing indicated to Dr. Ghostley that Plaintiff's intellectual functioning was above average. *Id.* His diagnosis was major depressive disorder, in partial remission. *Id.* He said, however, that Plaintiff's prognosis was "dim." *Id.* He recommended that she continue to take her medications as prescribed. *Id.*

On September 14, 2004, Sam R. Banner, M.D., performed a consultative physical examination of Plaintiff. R. 236. Dr. Banner first set forth Plaintiff's history and complaints, including multiple joint pain, swelling, difficulty walking and standing, severe fatigue, hair loss, weight gain, memory loss, and diminished concentration. *Id.* He also noted low back pain, arthritis, depression, and anxiety by history. *Id.* Dr. Banner found on examination that Plaintiff had apparently normal flexion and extension of her neck, extremities, and back, with no muscle spasm. R. 237-238. He said she had no pain or difficulty getting onto the table, had normal gait, could squat only minimally, had full strength in all muscle groups in the upper and lower extremities without atrophy, her seated leg raising was negative for pain in both legs, and her fine and gross motions and manipulations of both hands were satisfactory. R. 239.

On November 8, 2004, Dr. Crayton saw Plaintiff primarily for refills of medication. R. 250. She reported that she was having joint pain and rashes. *Id.* He found no active synovitis and Plaintiff's skin was clear. *Id.* She had been told that the rash was a symptom of lupus, and she said she was having trouble with her exercise due to joint pain. *Id.* Dr. Clayton increased the dosage of Celebrex and Plaquenil. *Id.* The only diagnosis was SLE, not fibromyalgia. *Id.*

Also on November 8, 2004, Plaintiff told Dr. Patel that she thought that Wellbutrin made her tired and even sleepy. R. 261. Plaintiff told Dr. Patel that she had not taken Xanax because she feared somnolence. *Id.* Dr. Patel adjusted her medications, and noted that her mood was not particularly depressed, though her affect was somewhat constricted. *Id.* He sent his records to the social security office. *Id.*

On December 9, 2004, Cutler saw Plaintiff. R. 325. Plaintiff's mood was normal and her affect was appropriate. *Id.* She was fully oriented and she was relaxed and calm. *Id.* Her traveling to see her family had helped to elevate her mood. *Id.* Cutler discussed with Plaintiff the possibility of doing medical transcription work from home. *Id.*

Cutler saw Plaintiff again on February 20, 2005. R. 324. Plaintiff's mood was normal and her affect was appropriate. *Id.* She was fully oriented and she was relaxed and calm. *Id.* She had gone through the holidays without an extremely low mood. *Id.*

On March 2, 2005, Plaintiff saw Dr. Patel. R. 319. Xanax had been prescribed "for extreme anxiety." *Id.* Dr. Patel said that "no medication side effects were voiced or noted." *Id.* Plaintiff had not noticed improvement in energy level with the changes to her medications. *Id.*

On June 9, 2005, Plaintiff saw Cutler. R. 322. She had started walking with a cane during the day, and was still having pain in her joints and feet. *Id.* She had been swimming in the lake near her home and felt that this had helped emotionally and physically. *Id.* She planned an annual fall trip. *Id.*

On December 1, 2005, Plaintiff told Cutler that she had returned from her six week stay with family in Michigan. R. 321. She said she had had bouts of depression, but the depression had lifted somewhat when she left. *Id.* She was glad to be back home. *Id.*

On December 8, 2005, Plaintiff saw Dr. Patel. R. 318. He noted that she had substituted Lexapro for "Celexa for quite some time with good results." *Id.*

On May 17, 2006, Plaintiff was seen by Dr. Patel. R. 316. Plaintiff on her own had lowered her dosage of Wellbutrin and had not noticed any difference in her mood. *Id*. She related that she had taken Xanax to calm herself for a pending airplane flight and had done remarkably well, and was not anxious at all. *Id*. She had been quite anxious without Xanax the day before. *Id*.

On July 14, 2006, Cutler completed a second checklist expressing her opinion as to Plaintiff's ability to do work-related activities. R. 328. Cutler thought that Plaintiff had moderate limitations (some limitation but still able to function) in her ability to understand, remember, and carry out instructions. *Id*. Cutler based this opinion upon therapeutic sessions with Plaintiff since February 3, 2003. Cutler also thought that due to Plaintiff's depressive symptoms, Plaintiff had moderate limitations in her ability to respond appropriately to work pressures and to changes in a routine work setting. R. 329.

**Legal analysis**

> **Whether the ALJ erred in failing to properly determine Plaintiff's mental residual functional capacity and in relying upon the grids, the Medical-Vocational Guidelines**

At step three, the ALJ wrote: "Giving the claimant the benefit of the doubt, her degree of limitation in maintaining concentration, persistence and pace is 'moderate'." R. 22. Plaintiff argues that this finding should have been a part of the mental residual functional capacity determination made by the ALJ. Doc. 15, p. 12. Plaintiff points out that the residual functional capacity assessment determination, which occurs at step four, is different from the evaluation of mental impairments at steps two and three. *Id*.

Plaintiff argues that the ALJ erred by not carrying forward these findings to step four and thus failed to make a proper mental residual functional capacity finding. *Id*. Plaintiff argues that a full range of unskilled sedentary work is precluded by her moderate limitations in maintaining concentration, persistence, and pace. *Id*. She also points out that Dr. Martin, the state agency psychologist, determined that Plaintiff's moderate mental limitations limit Plaintiff to "routine, repetitive tasks," and this would preclude a full range of unskilled sedentary work. *Id*. Plaintiff argues that had these limitations been included in the residual functional capacity assessment, the ALJ should not have relied on the "grids," and instead, should have asked the vocational expert to testify as to jobs which Plaintiff may do within a limited residual functional capacity. This particular argument, therefore, is not that Plaintiff's specific mental impairments in concentration, persistence, and pace are greater than moderate, but that these moderate impairments, and the limitation to routine, repetitive work, should have formed the basis for a hypothetical put to a vocational expert.

While the ALJ did not specifically mention these mental limitations in her residual functional capacity determination, R. 23, she implicitly assumed those limitations at step four. She wrote that Plaintiff could not perform her past relevant work due to Plaintiff's "moderate concentration difficulties." R. 24. In the absence of further explication, it must be assumed that this refers to the step three finding, that Plaintiff is moderately limited in concentration, persistence, and pace.[18] Then, at step five, the ALJ determined

_____

[18] The step three finding is not without doubt as the ALJ pointed to contrary evidence. The ALJ first said that Plaintiff's "concentration was unimpaired as evidence by her ability to correctly perform simple mathematical calculations and serial spelling tasks." R. 22. She also noted, however, that from an evaluation on September 13,

that Plaintiff's "non-exertional limitation [the moderate limitation identified at step three] has no significant affect [sic] on unskilled work at the sedentary level." R. 25.

Defendant argues: "The ALJ's finding that Plaintiff could only perform unskilled work properly accounts for Plaintiff's moderate limitations in concentration, persistence, and pace." Doc. 21, p. 8. Defendant argues that this is so because unskilled work is defined by 20 C.F.R. § 1568(a) as requiring "little or no judgment to do simple duties that can be learned on the job in a short period of time." *Id.* Defendant concludes: "Therefore, an individual with moderate limitations in concentration, persistence, and pace could still perform unskilled work." *Id.*

This is not persuasive. Whether or not a job is simple or unskilled does not address the issue of inability to concentrate, persist, or keep on pace. A person might have the intelligence to do an unskilled job and yet not perform adequately due to moderate problems with concentration, or persistence, or pace.

Two unpublished Eleventh Circuit decisions are helpful here. First is <u>Vuxta v. Commissioner of Social Sec.</u>, 194 Fed.Appx. 874 (11th Cir. Sep 8, 2006) (not selected for publication in the Federal Reporter, No. 06-11768), decided a few weeks before the ALJ's opinion. In that case, the ALJ had found that Plaintiff was limited to "simple and repetitive work," but determined that she was limited to only "unskilled work" in his

--------------------

2004, "the limitations flowing from the claimant's diagnosed mental impairments impacts primarily her ability to concentrate and maintain attention." *Id.* Then, after giving Plaintiff the "benefit of the doubt," she said that "[t]here is no noted concentration difficulties in the consultative psychological evaluation and in treatment records." *Id.* The ALJ concluded by adopting the findings in the non-examining report by Eric Martin, Ph.D., Ex. B12F. *Id.* There, Dr. Martin determined that Plaintiff has moderate difficulties in maintaining concentration, persistence or pace. R. 285.

residual functional capacity assessment. 194 Fed.Appx. at 877. Plaintiff contended

that:

> . . . the ALJ was required to find whether the restriction to simple,
> repetitive work impacts her ability to perform a wide range of jobs at the
> light, unskilled level. She further argues the ALJ erroneously relied
> exclusively on the medical-vocational guidelines (grids) in determining
> there were jobs available in the national economy she could perform.

*Id.*

Vuxta noted the well-established rule that exclusive reliance upon the grids is not

appropriate "*either* when the claimant is unable to perform a full range of work at a given

residual functional level or when a claimant has non-exertional impairments that

significantly limit basic work skills." *Id.*, at 878, *quoting* Phillips v. Barnhart, 357 F.3d

1232, 1242 (11th Cir. 2004) (emphasis by the court in Phillips).

> "This Court has interpreted 'significantly limit basic work skills' as
> limitations that prohibit a claimant from performing 'a wide range' of work
> at a given work level" *Id.* at 1243. "The ALJ must make a specific finding
> as to whether the nonexertional limitations are severe enough to preclude
> a wide range of employment at the given work capacity level indicated by
> the exertional limitations." Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir.
> 1995) (quotation omitted).

*Id.* Vuxta noted that the ALJ had determined that the claimant's exertional residual

functional capacity was for light work and "her nonexertional RFC was for unskilled

work." *Id.* The ALJ then relied upon the grids to find that the claimant was not disabled.

*Id.* The court then made a significant distinction between a limitation to perform simple

tasks and a limitation for repetitive tasks. The court said that a simple tasks limitation

does mean a limitation to unskilled work, and thus the ALJ did not err using the grids as

to that limitation. *Id.* The court then said:

If, however, the ALJ determined that a limitation to repetitive tasks significantly limited Vuxta's basic work skills, then the ALJ was required to consult a VE [vocational expert]. The ALJ must address and resolve this issue before relying on the grids.

*Id.* The issue was remanded for further consideration. *Id.*

The second case is <u>Richter v. Commissioner Of Social Security</u>, 2010 WL 2017650 (11th Cir. May 21, 2010) (not selected for publication in the Federal Reporter, No. 09-12674), decided many months after the ALJ's opinion. This case, like <u>Vuxta</u>, was a step five case, but unlike <u>Vuxta</u>, concerned the limitations that should have been in the hypothetical put to a vocational expert. There, like the case at bar, the ALJ found that the claimant had "moderate difficulties in the ability to sustain concentration, persistence, or pace." 2010 WL 2017650, *1. He did not, however, explicitly include these limitations in the hypothetical he posed to the vocational expert. *Id.* The court noted the rule that while the hypothetical need not include all of the claimant's symptoms, it "must include 'all of the claimant's impairments' or the vocational expert's testimony cannot substantial evidence" to support the ALJ's decision. *Id.*, at *2, *quoting* <u>Ingram v. Comm'r of Soc. Sec. Admin.</u>, 496 F.3d 1253, 1270 (11th Cir. 2007). The court reviewed cases from other circuits that had "rejected the argument raised by Commissioner in this case that an ALJ generally accounts for a claimant's deficiencies in concentration, persistence, and pace by restricting the vocational expert's inquiry to simple, routine tasks or unskilled work." *Id.* The court acknowledge that in some cases, depending upon the evidence, a different result might obtain, but it found those cases inapplicable. *Id.* It noted that:

> . . . testifying psychologists viewed limitations in the ability to remember,
> understand, and carry out simple instructions differently from limitations
> related to concentration, persistence, or pace, as Dr. Alvarez-Mullin noted
> that Richter was not limited in the former but did have moderate limitations
> in her ability to maintain attention and concentration for an extended
> period of time.

*Id.*, at *3. It also noted that the psychiatrists who found that the claimant had difficulties

in concentration, persistence, and pace "did not indicate that despite these limitations

she could perform simple, routine, repetitive tasks characteristic of unskilled labor." *Id.*

The court found that it would be important for the vocational expert to state whether the

simple, unskilled jobs identified would be ones which a person with moderate difficulties

in concentration, persistence, and pace still could do. *Id.* Finally, the court held that

since the claimant's difficulties in concentration, persistence, and pace had been

identified in the Psychiatric Review Technique Form (PRTF), those same limitations had

to be included in the hypothetical posed to the vocational expert. *Id.* The court

concluded:

> In sum, on this record, we conclude that the ALJ's failure to include all of
> Richter's impairments in his hypothetical question was error. This error
> was not harmless because the inquiry conducted by the vocational expert
> did not implicitly account for Richter's deficiencies in concentration,
> persistence, and pace. Additionally, there is no medical evidence that,
> despite these limitations, Richter nevertheless retained the ability to
> perform simple, repetitive, and routine tasks or unskilled labor. Instead,
> there is some evidence that Richter would have a moderate difficulty in
> this respect due to her psychiatric instability and anxiety-related disorder.
> Consequently, the vocational expert's testimony and the ALJ's ultimate
> finding that Richter was not disabled were unsupported by substantial
> evidence.

*Id.*, at \*4.  The case was remanded for further consideration.  *Id.*  To like effect is <u>Wood</u>

<u>v. Commissioner of Social Sec.</u>, 2010 WL 1408404, \*10-13 (M.D. Fla. Apr 2, 2010) (No.

609-CV-1090-ORL-GJK) and district court cases cited.

The issue in the case at bar, therefore, is whether Plaintiff's moderate difficulties

with concentration, persistence, or pace "significantly limit basic work skills." <u>Phillips v.</u>

<u>Barnhart</u>, 357 F.3d 1232, 1142 (11th Cir. 2004), *quoting* <u>Francis v. Heckler</u>, 749 F.2d

1562, 1566 (11th Cir. 1985).  If it does, then the ALJ could not rely upon the grids, and

should have relied upon evidence from the vocational expert.  This case should be

remanded for the ALJ to make that determination in the first instance.  If the grids are

not applicable, then vocational testimony is needed and the ALJ must concluded these

moderate limitations in the hypothetical posed to the vocational expert.

The ALJ should also explicitly determine whether Plaintiff is limited to routine,

repetitive work, and if so, whether that limitation significantly limited Plaintiff's basic work

skills.  If it did, then according to <u>Vuxta</u>, *supra*, that limitation must also be added to the

hypothetical.

### Whether the ALJ erred in finding that Plaintiff was not entirely credible

Plaintiff argues that the ALJ failed to consider the entire record, and unfairly

selected evidence to support her conclusion that Plaintiff's testimony was not entirely

credible.  Doc. 15, pp. 14-16.  Pain and other symptoms reasonably attributed to a

medically determinable impairment are relevant evidence for determining residual

functional capacity.  Social Security Ruling 96-8p, p. 4.  Pain and other symptoms may

affect either exertional or non-exertional capacity, or both.  *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain. *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so. *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987). Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true. *See Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002). The reasons articulated by the ALJ for disregarding the claimant's subjective testimony must be based upon substantial evidence. Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991). It is not necessary that the ALJ expressly identify this circuit's standard if his findings "leave no doubt as to the appropriate result" under the law. Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

On October 25, 2006, the date of the decision, the ALJ gave the following reasons for discounting Plaintiff's testimony. First, the ALJ said that after April 10, 2003, Plaintiff had no medical treatment until November 8, 2004, and that after November, 2004, until the date of the decision she had had no medical treatment. R. 23. The ALJ also noted that Plaintiff was unable to afford medical treatment, and that she obtains sample medication from family members who are physicians. *Id.* The ALJ thought there was inconsistency in Plaintiff's testimony, in that she said her parents are in good health but reported to her physician that she was caring for her mother, who was ill. *Id.* The ALJ noted that Plaintiff swims, "which she reports helps physically and emotionally," and she travels once a year. *Id.* The ALJ found that Dr. Banner, on September 14,

2004, found her to be within normal limits, with good range of motion of all joints, no spasm or deformity of her back, with normal gait and station, intact motor strength in all extremities, and satisfactory fine and gross motion in both hands. R. 24. The ALJ said that there were "minimal objective findings regarding the claimant's allegations including medication side-effects, as she reports to her treating physician that she has no problems with medication." *Id.*

On April 10, 2003, Dr. Crayton tried to adjust Plaintiff's medications for lupus in anticipation of the end of her health insurance. R. 251. Plaintiff continued, however, to go to psychological counseling with Robbie Cutler through December 1, 2005. R. 229-232, 221-225, 321-327. Plaintiff saw Dr. Patel, her psychiatrist, on August 5, 2003, for psychological medications. R. 266. She continued with Dr. Patel as needed to adjust those mental health medications. R. 264 (December 5, 2003); R. 263 (February 26, 2004); R. 262 (June 17, 2004). The gap in treatment, therefore, is that Plaintiff did not return to Dr. Crayton for treatment of lupus and fibromyalgia until November 8, 2004. R. 250. After that, until July 14, 2006, when the medical record ends, Plaintiff did not again see Dr. Crayton, as the ALJ found. She was still continuously receiving psychological counseling and treatment, however, as noted above.

The Commissioner may deny benefits "when a claimant, without good reason, fails to follow a prescribed course of treatment that could restore her ability to work." McCall v. Bowen, 846 F.2d 1317, 1319 (11th Cir. 1988); Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988); Lucas v. Sullivan, 918 F.2d 1567, 1571 (11th Cir. 1990). "In order to deny benefits on the ground of failure to follow prescribed treatment, the

ALJ must find that had the claimant followed the prescribed treatment, the claimant's ability to work would have been restored," and this finding itself must be supported by substantial evidence. <u>Dawkins</u>, 848 F.2d at 1213 (citations omitted). Poverty excuses noncompliance. *Id.*

Plaintiff said that she had not continued to see her rheumatologist for lupus and fibromyalgia because she could not afford it. R. 350. The note that her health insurance was about to expire, R. 251, supports that testimony. Plaintiff also said that Dr. Crayton did not prescribe medication for her any more, and that she got samples from family members who are physicians. R. 361. There is no evidence to identify the kind of treatment for lupus and fibromyalgia that might have restored Plaintiff's ability to work. It is highly probable that the medication and exercise she took was all that was medically available to Plaintiff, and she obtained medication through family sources and regularly swam. In summary, the gaps in medical treatment do not provide substantial evidence to disbelieve Plaintiff's testimony as to the extent of her disabilities.

The second reason given for discrediting Plaintiff is that at one point Plaintiff said that her parents were in good health and at another point she said she had to care for her mother, who was ill. This is not substantial evidence in context to discredit Plaintiff. It was the ALJ who prefaced a question to Plaintiff that she (the ALJ) knew from Ms. Cutler's notes that Plaintiff's mother had been ill. R. 365. She then asked Plaintiff whether her parents regularly need assistance, or just on occasion, and Plaintiff said just on occasion, that they were in "fairly good health." *Id.* Periodic illness on occasion

and fairly good health otherwise is the condition of most people, young or old. There is no inconsistency.

The ALJ noted that Plaintiff swims, "which she reports helps physically and emotionally," and she travels once a year. *Id.* Were this evidence of an ability to work 40 hours a week, continuously for a year, this would be substantial evidence to discredit Plaintiff's testimony. But it is not. It is evidence that Plaintiff is trying to help her condition by swimming regularly. It is rather odd to decide that a claimant's testimony about the limiting effects of her medical condition cannot be believed because she is dedicated to improving her condition through exercise. Likewise, evidence that Plaintiff can frequently travel would be substantial evidence to disbelieve her testimony, but a single annual trip to see family, a trip to help with depression, is not.

Dr. Banner's consultative examination found that Plaintiff had good range of motion of all joints, no spasm or deformity of her back, normal gait and station, intact motor strength in all extremities, and satisfactory fine and gross motion in both hands. But this is not substantial evidence to discount Plaintiff's testimony. "Fibromyalgia is a rheumatic disease and the relevant specialist is a rheumatologist." Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996). The signs of fibromyalgia, according to American College of Rheumatology guidelines, are primarily tender points on the body. Green-Younger v. Barnhart, 335 F.3d 99, 107 (2nd Cir. 2003). It is a misunderstanding of the nature of fibromyalgia to require " 'objective' evidence for a disease that eludes such measurement." Green-Younger, 335 F.3d at 108; Lee v. BellSouth Telecommunications, Inc., 2009 WL 596006, *8 (11th Cir. Mar 10, 2009) (not selected

for publication in the Federal Reporter, No. 07-14901). "Moreover, a growing number of

courts, including our own . . . have recognized that fibromyalgia is a disabling

impairment and that 'there are no objective tests which can conclusively confirm the

disease.' " Green-Younger, 335 F.3d at 108 (citations to cases from the 6th, 8th, and

9th Circuits omitted). "[P]hysical examinations will usually yield normal results – a full

range of motion, no joint swelling, as well as normal muscle strength and neurological

reactions." Id., at 108-109. "[S]welling of the joints is not a symptom of fibromyalgia  . .

. ." Sarchet, 78 F.3d at 307.[19] See also Brown v. Barnhart, No. 05-5143, 2006 WL

1431446, *2 and n. 1 (10th Cir. 2006) (unpublished). Thus, the consultative

examination by Dr. Banner is not substantial evidence to discount Plaintiff's testimony.

Finally, the ALJ reasoned that Plaintiff's testimony should not be believed

because she had not had adverse side effects from her medications. Perhaps the ALJ

refers to Plaintiff's testimony that Xanax, which she takes for anxiety, made her "fuzzy

and slow." R. 358. On October 16, 2002, Dr. Crayton reviewed Plaintiff's medications

and said that Plaintiff denied any side effects from her medications, but Xanax was not

---

[19] The Eleventh adopted this reasoning in an unpublished decision, Stewart v. Apfel, No. 99-6132, 245 F.3d 793, 2000 U.S.App. LEXIS 33214 (11th Cir. Dec. 20, 2000). In Moore v. Barnhart, 405 F.3d 1208 (11th Cir. 2005), while acknowledging that Stewart is not binding precedent, the court said:

> In Stewart, we reviewed medical research on fibromyalgia, which often lacks medical or laboratory signs, and is generally diagnosed mostly on a individual's described symptoms. Because the impairment's hallmark is thus a lack of objective evidence, we reversed an ALJ's determination that a fibromyalgia claimant's testimony was incredible based on the lack of objective evidence documenting the impairment. Id. 245 F.3d 793, 2000 U.S.App. LEXIS 33214, at *9, n. 4.

405 F.3d at 1211 and n. 3.

among the medications listed. R. 256. On November 8, 2004, Plaintiff told Dr. Patel

that she thought that Wellbutrin made her tired and even sleepy, and she had not taken

Xanax because she feared somnolence. R. 261. This medical note is entirely

consistent with Plaintiff's testimony. On March 2, 2005, Xanax was among the listed

medications, but was to be taken only for extreme anxiety. R. 319. Thus, when Dr.

Patel noted no current side effects (including no side effects from Wellbutrin), it was

unclear whether Xanax had been taken and was among those which produced no side

effects. *Id.* On May 17, 2006, Plaintiff reported that she had taken Xanax to calm

herself for a pending airplane flight and said that she had done remarkably well. R. 316.

It is doubtful, however, that Plaintiff would have complained of suffering sleepiness from

Xanax in this context since the purpose of taking Xanax was to produce calm during the

airplane flight. In summary, the only testimony at issue concerns Xanax, and the

medical notes are do not undermine the credibility of that testimony.

Since the reasons set forth by the ALJ for not believing Plaintiff are not supported

by substantial evidence in the record to support that conclusion, the caselaw above

provides that the court must now accept that testimony as true. I do not so recommend

here, however, since the evidence from Dr. Crayton is so sketchy. Since this case must

be remanded, a remand will afford another opportunity for Plaintiff and the ALJ to gather

more evidence from a rheumatologist as to the disabling effects of lupus and

fibromyalgia.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge were not based upon substantial evidence in the record and did not correctly follow the law. The decision of the Commissioner to deny Plaintiff's application for benefits should be reversed and remanded.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** and **REMANDED** for reconsideration as to the issues identified in this report and recommendation.

**IN CHAMBERS** at Tallahassee, Florida, on September 17, 2010.

s/     William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

Case No. 5:09cv358-RS/WCS